[No.-4500.]

## ADELAIDE PEARSON v. LAURA PEARSON ET AL.

MANUMISSION OF A SLAVE.—The marriage of a master with his female slave amounts to a relinquishment of his right to hold her as a slave and manumits her.

MARRIAGE BETWEEN MASTER AND SLAVE.—If one holding a female slave of African descent in Missouri, removed with her to the Territory of Utah, and there married her, the marriage was legal, there being no local law in Utah prohibiting such marriage.

VALIDITY OF MARRIAGE.—A marriage contracted without this State, which is valid by the law of the place where contracted, is valid in this State if the parties subsequently remove here, even though the marriage would have been invalid by the laws of this State if contracted here.

APPEAL from the District Court, Tenth Judicial District, County of Colusa.

Adelaide Pearson, the plaintiff, was the legitimate child of Richard Pearson and his former wife, from whom he was divorced, and was born in Missouri on the 10th day of October, 1850. The defendant Laura claimed to have been the legal wife of Richard, but the plaintiff denied that she became such. Richard Pearson made a will just before his death, in which he bequeathed all his property to Laura and her children. No provision was made for and no allusion was made to his daughter Adelaide, the plaintiff.

Under our statute of wills, the daughter Adelaide, having been pretermitted in the will, was entitled to the same share of the estate she would have received if her father had died intestate. If Laura was the wife of Richard, then Adelaide was only entitled to share the estate with Laura and her children. But if Laura was not the wife of Richard, then Adelaide was entitled to the whole. This case was once before this Court (46 Cal. 609), and everything in regard to the rights of the parties had been fully settled and determined, except the question as to whether Laura was or was not the wife of Richard. The court below held, on the second trial, that Laura Pearson was the lawful wife of Richard, and this appeal was taken by the plaintiff to test the correctness of the decision in that re-

gard.   The only question raised was in relation to that point. The court below gave judgment for the plaintiff for an undivided one-seventh of two-thirds of the demanded premises. There were seven children—the plaintiff, and six born to the testator and defendant Laura—and under our statute of descents and distributions, the wife, where there is more than one child, inherits one-third, and the children two-thirds.   The action was brought to recover all the land of which the testator died seized.

*W. F. Good, P. Vanclief and Beatty & Denson,* for the Appellant.

A slave is incapable of contracting marriage, and if Laura remained a slave up to the time she reached California, in 1855, certainly she could not have been married to Richard Pearson in the Territory of Utah, in the year 1854. (Bishop on Marriage and Divorce, vol. 1, Sec. 154–56; 6 Jones N. Carolina, 235–6; 9 Alabama, 990; 24 Id. 719.)

If Laura was a slave in Missouri, she remained a slave whilst passing through the Territory of Utah. (See the Dred Scott Case, 19 How. 393.)

*Currey & Evans and John T. Harrington,* for the Respondents.

Laura's emancipation prior to the marriage is to be inferred from Pearson's acts and conduct.   If it could be held that Laura was a slave in Utah, notwithstanding Pearson's failure to make and file the proof required by the statute, then we maintain that she ceased entirely to be a slave upon her marriage with Pearson.   In New York it has been held that where a man bought a slave woman and her child for the purpose of marrying the mother, and with the intention that they should be free, that his declaration on the subject, and the fact that he married the woman, were sufficient evidence of emancipation of mother and child.   (*Wells* v. *Lane,* 9 Johns. 144.)   Emancipation will be inferred wherever the master's conduct towards the slave is inconsistent with the continuance of the condition of slavery. (*La Grand* v. *Darnell,* 2 Pet. 664.)   See dissenting opinion

of Justice Curtis, in the Dred Scott Case (19 How. 600), where he says: "There can be no more effectual abandonment of the legal rights of a master over his slave, than by the consent of the master that the slave should enter into a contract of marriage in a free State, attended by all the civil rights and obligations which belong to that condition." (See also Reeves's Domestic Relations, 341.)

Utah having been acquired from a civil law country, great weight should be attached to that law on the subject of marriage, in considering the case at bar. The Supreme Court of the United States has said that the laws applicable to the Spanish-American colonies, "consisted of a code issued by the Council of the Indies, antecedent to the Council of Trent, and are to be found in the code or treatise called 'Las Siete Partidas,' and the 'Laws of Toro.' The law of marriage, as contained in the Partidas, is the same as that which we have stated to be the general law of Europe, antecedent to the council, namely, that consent alone, joined with the will to marry, constitutes marriage." (10 How. U. S. 181, 182.) Under the law as laid down in the Partidas, slaves could contract marriage with each other or with free persons.

"It has been for a long time the usage, and the Holy Church has consented, that slaves should intermarry with one another. Likewise, a slave may marry a free woman, and the marriage will be valid if she knew at the time she married him that he was a slave; and so may a female slave marry a free man." (4th Partida, Title 5, Law 1.)

By the COURT:

The action is ejectment, and was brought by the appellant, Adelaide Pearson, as heir-at-law of Richard Pearson, deceased, to recover of the defendants certain premises situate in the county of Colusa. The appellant was born in the year 1850, and is a daughter of said Richard Pearson, a white man (lately deceased), by Martha Powers, a white woman, with whom he intermarried in the year 1848, in the State of Iowa, and from whom he was divorced in the year 1854, by a valid judicial decree rendered in the courts of

the State of Missouri.   The defendant, Laura Pearson, is a
woman of African descent, and claims a distributive share in
the estate of said Richard Pearson, as being his surviving
wife.   The other defendants are the children of Richard
Pearson by said Laura, and were born after the alleged in-
termarriage between said Richard and said Laura, presently
to be mentioned, and during the subsequent cohabitation
between said Richard and said Laura in the assumed rela-
tion of husband and wife.   It appears that in the year 1847,
the defendant, Laura, being at the time a slave in the State
of North Carolina, was purchased by said Richard Pearson,
who immediately removed her to the State of Missouri,
where he held her as a slave until the year 1854, during
which year (and after the entry of the decree in the courts
of that State divorcing him from Martha Powers) he re-
moved her to the Territory of Utah, reaching the Territory
in September of that year, where he remained engaged in
business pursuits until the year 1855, when he removed to
this State and settled in the county of Colusa, in which
county he continued to reside until his death in the year
1865.

The court below found the fact to be that in the fall of
the year 1854, and while residing in the Territory of Utah,
the said Richard and Laura intermarried, and thence until
the death of said Richard they lived and cohabited together
as husband and wife, and that during such cohabitation
there were born to them the defendants Theodore, Henry,
Mary, William Richard, and Jefferson—the oldest of these
children being born in the year 1856, and the youngest
shortly before the death of the said Richard.   Judgment
was, thereupon, rendered to the effect that upon the death
of said Richard his estate descended to and vested in the
plaintiff and defendants in all respects as though the de-
fendant Laura had been a white woman and the lawful sur-
viving wife of said Richard; and from this judgment and
an order subsequently entered, denying the motion of the
plaintiff for a new trial, she prosecutes this appeal.

1. At the trial, the defendant Laura Pearson, examined
as a witness for the defendants, having testified that she had

been at one time the slave of Richard Pearson in the State
of Missouri, but that she had subsequently been emanci-
pated by him by certain judicial proceedings had for that
purpose, of which a record was duly made in a court in the
city of St. Louis; the plaintiff duly objected to oral proof of
her alleged emancipation, but the objection was overruled,
and an exception was reserved. The views we entertain
upon other points involved render it unnecessary to notice
this exception further.

2. It is argued for the appellant that the alleged marriage
between said Richard and said defendant, Laura, even if
solemnized in due form, was void, because she was at the
time a slave, and, therefore, incapable of contracting mar-
riage. But we see no force in this position. Conceding
that she had been a slave in the State of Missouri in 1854,
she was such only by force of the local law at the time pre-
vailing in that State, and conceding that her removal by her
master to the Territory of Utah did not of itself change
her status in that respect, and that Pearson might thereafter
lawfully hold her in slavery in that Territory, it certainly
cannot be denied that he might, if he chose, manumit her
there by any act evidencing a purpose on his part to do so.

His general authority as a master to manumit his slave
was not taken away nor limited in its exercise by the local
law of Utah, and we think that his intermarriage with her
in that Territory amounted to a relinquishment of his claim
to further hold her as his slave. At common law, if a man
bound himself in a bond to his villein, granted him an an-
nuity, or gave him an estate, even for years, it was held to
be an implied manumission, "for this was dealing with his
villein on the footing of a freeman." There being no law
or regulation at the time prevailing in the Territory of Utah
interdicting intermarriage between white and black persons,
we think that such an intermarriage lawfully had there be-
tween a master and his female slave, neither party being
otherwise incapacitated to contract marriage, operated by
analogy to the rule of the common law already adverted to,
the manumission of the slave woman, since such manumis-
sion was indispensable to her assumption of her new rela-

tion of wife to her former master. She certainly could not, in contemplation of law, be both the slave and the wife of Pearson.

3. The marriage of these parties, being valid by the law of the place where it was contracted, is also valid in this State. The statute of this State provides in terms that all marriages contracted without the State, which would be valid by the laws of the country in which the same were contracted, shall be valid in all courts and places within this State. The statute accords with the general principle of law theretofore prevailing. The validity of a marriage (except it be polygamous or incestuous) is to be tested by the law of the place where it is celebrated. "If valid there, it is valid everywhere. It has a legal ubiquity of obligation. If invalid there, it is equally invalid everywhere. (Story on Conflict of Laws, Sec. 113.)

We discover in the record no error committed against the appellant.

Judgment and order denying a new trial affirmed.